BRISCOE, Circuit Judge,
dissenting:
I respectfully dissent. Although the majority concludes “that the district court’s ground for denying Yaffe’s motion for summary judgment — namely, that the Great American policy unambiguously indicated that Great American had no obligation to pay until the ACE policy was exhausted — was erroneous,” Maj. Op. at 1190, in my view it is the majority’s own conclusion that is erroneous.
I.
Before detailing my differences with the majority’s decision, I believe it is useful to briefly revisit the relevant facts of this case and, consistent with our obligation under Oklahoma law to construe the policy as a whole, to review all of the relevant Great American policy provisions together. See Bituminous Cas. Corp. v. Cowen Constr., Inc., 55 P.3d 1030, 1033 (Okla. 2002) (holding that an insurance policy must “ ‘be construed according to the entirety of its terms and conditions set forth in the policy and as amplified, extended, or modified by any rider, endorsement, or application attached to and made a part of the policy.’ ”) (quoting Okla. Stat. tit. 36, § 3621).
Effective October 1, 2004, Great American issued to Yaffe, in exchange for a premium of $272,310, a “Commercial Umbrella” policy with a policy period of October 1, 2004, to October 1, 2005. App. at 74, 86. The Great American policy provided total coverage of $25,000,000 for “[e]ach [occurrence” and in the aggregate. Id. at 86. The “INSURING AGREEMENTS” portion of the Great American policy provided, in pertinent part, as follows:
I. COVERAGE
We will pay on behalf of the “Insured” those sums in excess of the “Retained Limit ” that the “Insured” becomes legally obligated to pay by reason of liabil *1192 ity imposed by law or assumed by the “Insured” under an “insured contract” because of “bodily injury,” “property damage,” “personal injury,” or “advertising injury” that takes place during the Policy Period and is caused by an “occurrence” happening anywhere. The amount we will pay for damages is limited as described below in the Insurance Agreement Section II. LIMITS OF INSURANCE.
II. LIMITS OF INSURANCE
* * *
G. Retained Limit
We will be liable only for that portion of damages ... in excess of the “retained limit, ” which is the greater of:
1. the total amounts stated as the applicable limits of the underlying policies listed in the Schedule of Underlying Insurance and the applicable limits of any other insurance providing coverage to the “Insured” during the Policy Period; or
2. the amount stated in the Declarations as Self-Insured Retention [which in this case was “$ -0-”] as a result of any one “occurrence” not covered by the underlying policies listed in the Schedule of Underlying Insurance nor by any other insurance providing coverage to the “Insured” during the Policy Period;
and then up to an amount not exceeding the Each Occurrence Limit as stated in the Declarations [i.e., $25,000,000].
App. at 88-89 (emphasis added).
The Great American policy’s “Schedule of Underlying Insurance,” which is referenced in the policy’s definition of “Retained Limit,” listed three different policies, including “ACE AMERICAN POLICY: D35980490” (Ace American policy) which provided commercial general liability and employee benefit liability to Yaffe for the policy period of October 1, 2004, to October 1, 2005. Id. at 76. The Schedule of Underlying Insurance stated that the Ace American policy, to the extent it provided commercial general liability coverage, had a $2,000,000 general aggregate limit and a $1,000,000 “each occurrence” limit. Id.
Finally, the Great American policy contained the following three (I, J and P) relevant “CONDITIONS” provisions (which are found in § VI):
I. Maintenance of Underlying Insurance
During the period of this policy, you agree:
1. to keep the policies listed in the Schedule of Underlying Insurance in full force and effect;
2. that any renewals or replacements of the policies listed in the Schedule of Underlying Insurance will not be more restrictive in coverage;
3. that the Limits of Insurance of the policies listed in the Schedule of Underlying Insurance will be maintained except for any reduction or exhaustion of aggregate limits by payment of “claims” or “suits” for “occurrences” covered by “underlying insurance”; and
4. that the terms, conditions and endorsements of the policies listed in the Schedule of Underlying Insurance will not change during the period of this policy such as to increase the coverage afforded under the policy.
If you fail to comply with these requirements, we will only be liable to the same extent that we would have been had you fully complied with these requirements.
J. Other Insurance
If other insurance applies to a loss that is also covered by this policy, this policy will apply excess of the other insurance. Nothing herein will be construed to *1193 make this policy subject to the terms, conditions and limitations of such other insurance. However, this provision will not apply if the other insurance is specifically written to be excess of this policy.
P. When Loss Is Payable
Coverage under this policy will not apply unless and until any “Insured” or an “Insured’s” underlying insurer is obligated to pay the “retained limit.”
When the amount of loss has finally been determined, we will promptly pay on behalf of the “Insured” the amount of loss falling within the terms of this policy-
Id. at 99-100.
On December 28, 2004, an explosion occurred at Yaffe’s scrap yard in Muskogee, Oklahoma. Id. at 47. According to Yaffe, it incurred approximately $1,785,986.89 in total liabilities as a result of various claims resulting from the explosion. Id. Because, however, a majority of those claims were for amounts less than the $10,000 per-claim deductible set forth in the Ace American Policy, Ace American provided no coverage for those claims, leaving Yaffe responsible to pay $1,287,987.79 worth of claims. Id. at 47-48. In other words, Ace American, to date, has paid only $497,999.10 of the total liabilities incurred by Yaffe as a result of the explosion, leaving over half-a-million dollars remaining under the $1,000,000 “per occurrence” limit set forth in the Ace American Policy. Id. at 48.
Yaffe filed suit against Great American in the District Court of Muskogee County, Oklahoma. Yaffe’s complaint alleged that Great American had breached its contract of insurance by failing to reimburse Yaffe for its deductible obligations, and also sought a declaration that Great American would be obligated to reimburse Yaffe “for all amounts not covered by Yaffe’s underlying policy [the Ace American policy], including all deductible payments incurred by Yaffe.” Id. at 14-17. Alternatively, Yaffe sought a declaration that Great American was liable for all of Yaffe’s liabilities resulting from the accident that exceeded $1,000,000, regardless of who paid the first $1,000,000 in claims. Great American filed an answer, timely removed the action to federal district court, and then filed a counterclaim seeking a declaration that it had no duty to pay under its umbrella policy until and unless the limits of the Ace American primary policy had been paid. The parties subsequently filed cross-motions for summary judgment. The district court issued an opinion and order granting Great American’s motion for summary judgment and denying Yaffe’s cross-motion for summary judgment.
II.
Turning to the majority’s decision, it is first suggested that “the language in § I (Coverage) and § II.G (Retained Limit) of the Great American policy implies that coverage begins once Yaffe has incurred liabilities exceeding $1,000,000.” Maj. Op. at 1187. With this statement, the majority focuses on the phrase “total amounts,” as employed in § II.G, and omits the introductory requirement that limits Great American’s liability to only “that portion of damages ... in excess of the ‘retained limit.’ ” The majority then interprets the “total amounts” phrase to simply refer to a mathematic total equivalent to the applicable limits of any underlying policies maintained by the insured, in this case $1,000,000, omitting any requirement that these limits must be paid by the underlying policy insurer(s). In other words, the majority concludes that the sole purpose of § II.G’s reference to the “the applicable limits of the underlying policies” is to establish a threshold dollar amount, above which coverage under the umbrella policy *1194 will begin, and regardless of whether Yaffe or the underlying insurer(s) paid or were liable for the amounts below the threshold dollar amount.
In my view, this is a misreading of the policy. To begin with, it omits the key introductory language of § II.G that states Great American “will be liable only for that portion ... in excess of the ‘retained limit,’ which is the greater of’ (1) “the total amount stated as the applicable limits of the underlying policies listed in the Schedule of Underlying Insurance” (i.e., the Ace American policy, which had a per occurrence limit of $1,000,000) “and the applicable limits of any other insurance providing coverage to the ‘Insured’ during the policy period” (there were no such other policies in place in this case), or (2) “the amount stated in the Declarations as Self-Insured Retention” (i.e., zero). Although § II.G could perhaps be more clear, its reference to “the applicable limits of the underlying policies” was obviously intended, particularly when considered in light of the other relevant policy provisions, to mean that those limits have to be exhausted before coverage begins under the Great American policy. To conclude otherwise, as the majority does, effectively transforms the policy from its intended purpose as an excess policy into a primary insurance policy with a large deductible. If that is the proper interpretation, then one must ask why the policy repeatedly refers to the underlying policies and their applicable limits, and why the policy requires that those underlying policies be kept in full force and effect? If the majority’s interpretation were correct, there would be no need to refer at all to any underlying policies and their applicable limits. Stated differently, it would have been far simpler for the policy to establish a set deductible amount, rather than to establish that amount by reference to the applicable limits of the underlying insurance policies maintained by Yaffe. Notably, the majority concedes that the purpose of § II.G’s reference to underlying policies maintained by the insured is to ensure that the Retained Limit will be “automatically increased” in the event that the insured “acquire[s] additional underlying insurance.” Maj. Op. at 1187. But this concession, with which I agree, makes sense only if the Great American policy is interpreted as providing excess, rather than primary, coverage.
The majority further errs in construing § VI.J (“Other Insurance”) of the policy, which states: “If other insurance applies to a loss that is also covered by this policy, this policy will apply excess of the other insurance.” Although the majority acknowledges, as it must, that this language can reasonably be construed to “mean[] that the policy applies only after the primary coverage limits have been exhausted,” Maj. Op. at 1189 (internal quotation marks omitted), it suggests that “to a reasonable person ... the phrase ‘excess of the other insurance’ could well mean ‘to the extent that the other insurance is not required to pay (even if the other insurance applies to the loss).’ ” Id. at 1189. In my view, the plain language of § VI.J has only one reasonable interpretation and that interpretation clearly refutes the majority’s proposed alternative reading. Specifically, a reasonable insured in the position of Yaffe could only have read § VI.J to mean that the Great American policy would provide coverage for a loss only after the limits of any applicable underlying policies were exhausted.
The majority also reads too much into § VI.P of the Great American policy. That section, entitled “When Loss is Payable” and contained in the “Conditions” section of the policy, provides, in pertinent part, that “[cjoverage under this policy will not apply unless and until any ‘Insured’ or an ‘Insured’s’ underlying insurer is obligated to pay the ‘retained limit.’ ” App. at *1195 100. Although the majority speculates on the possible meanings of this provision and its impact on coverage, the fact is that § VLP does not purport to modify or otherwise impact the coverage provisions of the policy. Indeed, the second paragraph of § VLP confirms that the point of the subsection (as indicated by its title) is to specify “when,” not “how much,” Great American is obligated to pay: “When the amount of loss has finally been determined, we will promptly pay on behalf of the ‘Insured’ the amount of loss falling within the terms of this policy.”
Further, the majority all but overlooks § VI.I of the Great American policy.[1] That section, entitled “Maintenance of Underlying Insurance,” required Yaffe to keep the underlying policies listed in the schedule of insurance “in full force and effect” and to maintain the same coverage restrictions, limits, and terms and conditions during the life of the umbrella policy. Id. at 99. If, as the majority effectively concludes, the policy’s “retained limit” is nothing more than a mathematical liability amount that must be reached before coverage begins, then why would it have been necessary for Yaffe to maintain any underlying policies during the life of the Great American policy? The only answer the majority can muster is that “the actual coverage provided by the ACE policy and the exhaustion of the limits of that policy affect Great American’s duty (1) to defend Yaffe,” “and (2) to make payments for appeal bonds, prejudgment interest, and costs....” Maj. Op. at 1188. Again, however, this is a grossly distorted, and unnecessarily limited, reading of the policy language. In fact, the clear and undeniable purpose of § VI.I’s maintenance of underlying insurance requirement, consistent with the Great American policy as a whole, was to ensure that the policy operated as intended, i.e., as an excess liability policy that provided coverage only after exhaustion of the applicable limits of the underlying primary policies maintained by Yaffe.
Finally, the majority effectively ignores the fact that the liability incurred by Yaffe in this case resulted from the existence of multiple claims, and thus the application of multiple corresponding deductibles, under the Ace American policy. Although the majority suggests that the Great American policy can be reasonably construed to operate as an excess policy to fill gaps in the underlying insurance, it is clear that the deductible amounts that Yaffe was required to pay under the Ace American policy cannot reasonably be considered “gaps” in that policy. Rather, deductibles, “which [are] frequently referred to as self-insurance,” function “to alter the point at which an insurance company’s obligation to pay will ripen.” Int’l Bankers Ins. Co. v. Amone, 552 So.2d 908, 911 (Fla.1989); see Beech Aircraft Corp. v. United States, 797 F.2d 920, 922 (10th Cir.1986) (“If one having an insurable risk retains the risk of his own loss, there is no risk transfer, and the arrangement is self-insurance.”). In other words, Yaffe, by agreeing to the unusual deductible scheme set forth in the Ace American policy, chose (presumably in return for a lower premium on that policy) to accept the risk that it would be required to self-insure in the event of multiple claims arising out of an occurrence. As the district court correctly noted, “it is generally understood that ‘an excess insurer does not reimburse the insured for the amount of the primary policy deductible,’ ” App. at *1196 511 (quoting Couch on Insurance, (3d Ed.), § 220:36), and that “[t]he rationale for not including deductible payments as part of the limits of the underlying policy [wa]s grounded in the insured’s decision to, in essence, become self-insured for the deductible amount as a result of the bargain reached with the primary insurer.Id. at 511; see also Douglas R. Richmond, Issues and Problems in “Other Insurance,” Multiple Insurance, and Self-Insurance, 22 Pepp. L.Rev. 1373, 1399 (1995) (“The purpose of excess coverage or an umbrella policy is to protect the insured in the event of catastrophic losses in which liability exceeds available primary coverage. Excess and umbrella policies are intended to expand the amount, but not the scope of coverage. Therefore, only after the underlying primary policy has been exhausted will any umbrella policies kick in.”) (internal quotation marks omitted).
Considering the Great American policy as a whole, I agree with the district court that the policy cannot reasonably be construed to provide coverage for the circumstances alleged in Yaffe’s complaint. Therefore, I agree with the district court that Great American was entitled to summary judgment in its favor, and I would affirm the judgment of the district court.

. The majority complains that “Great American itself” has not expressly relied on § VI.I to supports its position. Maj. Op. at 1187. That complaint, however, carries no weight in light of our obligation under Oklahoma law to construe the policy "according to the entirety of its terms and conditions.... ” Bituminous Cas. Corp., 55 P.3d at 1033 (internal quotation marks omitted).